### CUBA v. LYKES BROTHERS-RIPLEY S. S. CO., Inc.

### No. 2081.

Court of Appeal of Louisiana. First Circuit.

Jan. 30, 1940.

OTT, Judge.

The suit is to recover compensation at the rate of $13.26 per week for 400 weeks, less a credit of $102.70 for compensation already paid, on account of an injury which plaintiff claims to have sustained on August 13, 1937, while loading rice on a steamship for the defendant as a longshoreman at the port of Lake Charles.

Plaintiff alleged in his petition and testified in the case that he was lifting and swinging a sack of rice weighing about 240 pounds with the assistance of another longshoreman in order to load the sack onto a truck from which the sack was to be loaded onto a ship; that as he and his partner were lifting and swinging this sack of rice, one end of the sack slipped out of the hands of his partner, causing plaintiff to fall across the sack, resulting in an injury to his back. After the injury, his foreman made out an accident report and sent plaintiff to the company doctor for treatment. This doctor treated plaintiff for sprained back for ten weeks during which time he drew compensation at the rate of $10.27 per week, after which time he was discharged by the doctor as able to return to work.

There is no dispute about the fact of employment of plaintiff in loading rice and the fact that he complained of an injury to his back and was paid compensation for ten weeks. While the pleadings indicate a dispute as to the weekly wage, this dispute is no longer an issue in the case, as the judgment awarded compensation on the basis of 65 per cent of $15.60 per week for a period not exceeding 400 weeks, less the amount paid, and there is no complaint by either side as to the amount of the weekly award. In fact, this is the amount of the weekly wage as admitted by the defendant and

the plaintiff asks in his brief in this court that the weekly compensation be fixed on this basis.

The only issue presented on the appeal is whether or not plaintiff is entitled to compensation after he was discharged by the doctor on October 21, 1937. This, of course, involves the question of the nature and extent of his injury.

We are satisfied, as was the trial judge, that the plaintiff did receive an injury in the sacro-iliac region when the heavy sack of rice slipped from his partner's grip and jerked plaintiff forward and across the sack. This kind of a jerk and fall was such as was calculated to cause a sprain or strain of the back. Plaintiff had been working more or less regularly up to this time and after the injury he complained of pain in the back on attempting to stoop over or lift an object requiring him to bend his back. The doctor treated him for sprained muscles of the back by applying adhesive strapping.

While an effort was made by the defendant to show that plaintiff worked several hours the day following the accident, yet we are not greatly impressed with the testimony on this point offered by the defendant, which consists principally of a time sheet made out by the foreman, showing that plaintiff worked four hours on the 14th of August. Not only does plaintiff deny that he worked the day after the accident, but the foreman and his assistant testified that plaintiff did not work any more after the report of the accident was made on the day the accident occurred.

On November 18, 1938, more than a year after the accident, Dr. S. F. Hatchette, a well-qualified and experienced radiologist, made some X-ray pictures of plaintiff's back one of these pictures showing, according to the interpretation of Dr. Hatchette, a chip fracture of the right articular facet of the sacrum. It is the opinion of this doctor that the fracture was an old one; that, while he could not say how long the fracture had been there, it was not a recent one, but it could have occurred a year or so previous to his examination and the reparative processes within that time could have caused the fracture to have the appearance he found in the X-ray.

Practically the whole case depends on the opinion and interpretation of the X-ray pictures as given by Dr. Hatchette, as it is conceded by the other experts that if there is a chip fracture of the right articular facet of the sacrum, such a fracture would likely cause pain on straining and lifting and thus disable plaintiff from lifting and loading heavy sacks of rice, the kind of work he was doing when injured.

Our review and examination of the evidence in the case does not convince us of any error on the part of the trial court when he found that plaintiff did suffer such a sacro-iliac injury which disables him from doing the kind of hard manual labor that he was doing when injured. Without going into a detailed analysis of all the lay and expert testimony, we list a few facts and circumstances which, in our opinion, support the conclusions of the trial judge.

(1) Unquestionably, Dr. Hatchette is fully competent not only to take X-ray pictures in such a way and in such positions as to locate any abnormality in the sacro-iliac region, but from his training and experience, he is also well qualified to read and interpret these pictures. Like the trial judge, we are very much impressed with his interpretation of these pictures and his explanation of the condition which they reveal. Dr. Fisher, who seems to have no interest in the case, read the pictures with Dr. Hatchette and concurred in his conclusion. While Dr. Fisher does not claim to be an expert in reading X-rays and while he admits that his opinion was somewhat influenced by Dr. Hatchette's interpretation, yet his own interpretation of these pictures lends some corroboration to the conclusions of Dr. Hatchette.

(2) The medical evidence shows that a fracture of the kind indicated by the testimony of these two doctors as existing in the sacro-iliac region would cause the kind of pain which plaintiff claims he suffered, and we see no reason why some weight should not be given to his statement that he does suffer pain in this region when he strains or bends his back.

(3) Plaintiff has not been able to perform the same kind of work since the accident as he did before, and there must be some condition in his back that has caused this change in his ability to work, unless we can find sufficient evidence to designate plaintiff as a malingerer, and this we cannot do.

(4) Dr. McKinney, a radiologist, called by the defendant, also made some X-ray pictures of plaintiff's sacro-iliac region from a slightly different angle from those made by Dr. Hatchette. The pictures made by both Dr. Hatchette and Dr. McKinney were examined by Doctors Holcombe,

Caldwell and Watkins for the defendant, who expressed the opinion that neither the Hatchette picture nor that of Dr. McKinney showed a fracture of the articular facet of the sacrum, but their opinion, as well as that of Dr. McKinney, was that this shadow appearing in this region on both pictures is merely a dark line or shadow caused by the edge of the body of the vertebra through which the rays have to penetrate. While Dr. McKinney is a radiologist, these other three doctors are not such, but they are either specialists in some line of surgery or general practitioners.

Dr. McKinney and these other three doctors base their conclusion on what they call a stereoscopic view which seems to be a method of taking several views of the area from different positions and then set up these different views in a stereoscope so as to get a full view through the area examined. Dr. Hatchette claims that this method is now recognized to be less reliable in securing pictures of areas such as the articular facet of the sacrum than the ordinary X-ray examination. Some of the other doctors admit that the stereoscopic view has been discarded by many experts in this field, except in those instances where no better views can be obtained.

(5) An effort is made by two of the doctors called by the defendant to ascribe plaintiff's condition to a venereal disease, yet, one of these doctors treated him for ten weeks without ascribing this as the cause of the trouble. Some of the doctors called by the defendant even intimated that plaintiff is a malingerer, yet we do not find sufficient facts to justify such an intimation.

(6) The trial judge had the opportunity of seeing and hearing plaintiff when he testified and knowing all the other witnesses, lay and expert. He was in a much better position to determine plaintiff's condition than we are, and, applying the well known rule in such cases, we must give great weight to his findings and leave them undisturbed unless manifestly erroneous.

In addition to the award of compensation for a period not exceeding 400 weeks at the rate of 65% of $15.60 per week, less the amount already paid, the trial court also awarded not to exceed $250 for medical and hospital expenses. Nowhere in the petition does plaintiff ask for any medical and hospital expenses, nor do we find a particle of evidence in the record to show that he has spent or will be re-

quired to spend anything for this purpose. It must have been an oversight in allowing this item, as it is elementary that the plaintiff cannot recover more than he asks for, and certainly not where there is neither a prayer for such an amount nor proof in support of it.

For the reasons assigned, it is ordered that the judgment appealed from be amended by disallowing the sum of not exceeding $250 for medical and hospital expenses; that in all other respects said judgment be affirmed at the cost of appellant in both courts.